IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAMIEN GREEN,

                Plaintiff,

  v.

DAWN M. LAURENT, KAREN ANDERSON,
DANIEL NORGE, DAVID MELBY, LUCAS WEBER,
MICHAEL MEISNER, RAY WOOD,
MICHAEL MORRISON, and SANDY HAUTAMAKI,[1]

                Defendants.

OPINION & ORDER

14-cv-326-jdp

---

     Plaintiff Damien Green, a prisoner at the Waupun Correctional Institution, brings claims against various supervisory officials at the Columbia Correctional Institution, alleging that he was allowed to stockpile medication while he was placed in observation at CCI, enabling him to twice attempt suicide by overdosing. He also brings claims against Daniel Norge, a CCI psychologist, for failing to properly respond to both overdoses. Defendants have filed a motion for summary judgment, which I will grant in part and deny in part regarding plaintiff's claims about his first overdose. I will direct the parties to provide supplemental briefing regarding the second overdose. I will also address various non-dispositive motions filed by the parties.

---

[1] I have amended the caption to reflect the correct spelling of defendants' full names and to identify the John and Jane Doe defendants. Plaintiff was granted leave to proceed against two Doe defendants, a deputy warden and a Health Services Unit manager. The Wisconsin Department of Justice accepted service on behalf of Sandy Hautamaki as the deputy warden and existing defendant Karen Anderson as the HSU manager. Plaintiff did not object to this, nor has he otherwise made efforts to identify someone else as the Does, so I will treat Hautamaki and Anderson as the proper identities of these defendants.

UNDISPUTED FACTS

The following facts are drawn from the parties' proposed findings of fact and supporting materials, and are undisputed unless otherwise noted.

Plaintiff Damien Green is currently an inmate at the Waupun Correctional Institution, but during the events in question, he was incarcerated at the Columbia Correctional Institution. Defendants all worked at CCI: Karen Anderson was supervisor of the Health Services Unit (HSU), Michael Meisner was the warden, Lucas Weber was the security director, David Melby was a corrections unit supervisor, Michael Morrison was a lieutenant, Raymond Wood was the Psychological Services Unit supervisor, Sandra Hautamaki was the deputy warden, and Daniel Norge was a psychological associate.[2]

At CCI, medications for inmates in general population housing units are either "controlled" or "non-controlled." Non-controlled medications include acetaminophen, ibuprofen, and aspirin, and may also include blood pressure medication and asthma inhalers. For all inmates, controlled medications are maintained under staff control until medication pass. During medication pass, an individual dose of the controlled medication is provided to the inmate.[3]

Access to medication is restricted further in segregation units. The Disciplinary Separation 1 unit, known as "DS-1," houses inmates who have just arrived in segregation or

---

[2] Plaintiff also brings claims against Dawn Laurent, a former psychologist at CCI acting in a supervisory role, but plaintiff now concedes that Laurent did not work at CCI during the events in question, so I will grant defendants' motion for summary judgment on plaintiff's claims against Laurent.

[3] Plaintiff objects to many of defendants' proposed findings of fact, stating "call for speculation." *See, e.g.*, Dkt. 162, at 5. But defendants' testimony about their knowledge of CCI's operations is admissible.

who are having behavioral problems and placed in observation status. Inmates in segregation cells have access to limited property and the cells are searched often. A segregation cell is also searched thoroughly prior to an inmate being transferred into that cell.

Observation status within the DS-1 unit is a restrictive status used for the purpose of preventing an inmate from inflicting harm upon himself or someone else. Inmates in observation status are given a smock without pockets, a mattress, and a thick blanket made especially for high-risk suicidal inmates. Each time an inmate leaves his observation cell for a shower, the cell is searched. Inmates in observation status are checked on by unit staff every 15 minutes throughout the day and night. Psychological staff conducts daily rounds of inmates on observation status. An inmate's placement in observation status is reviewed daily by a psychologist during the weekdays to either continue their placement or remove them from observation status; the inmate's behavior and mental health condition are evaluated to determine whether there is a risk to the inmate's safety or the safety of others, and the inmate's property can also be reviewed during these contacts to determine if property should be added or removed.

Inmates housed in segregation, including those in observation status, are not allowed to keep medication in their cells. All medication in segregation is controlled by staff, and distributed to the inmates at the frequency and dosage as prescribed. In segregation, staff is required to bring an inmate's medication to the cell and ask the inmate if he wants the medication. If the inmate requests his medication, the staff member delivers the dosage as prescribed into a cup or hand in view of the inmate. In order to receive the medication, the inmate extends his arm through the trap on the cell door and the staff member pours the cup or places the medication into the inmate's hand.

Once the inmate receives the medication in his hand, the inmate must immediately swallow the medication. The inmate opens his mouth to show the staff member that he has swallowed, and in doing so, the inmate must lift his tongue. The inmate may also need to spread his fingers so staff can make sure that the inmate did not hide the medication.

Plaintiff says that the correctional officers distributing medication at DS-1 do not always check to see whether inmates swallow their medication. Defendants state that "[t]here have been circumstances where inmates have partially swallowed medication enough for the officer dispensing the medication to not see the pill inside the inmate's mouth, and that "[a]fter the officer walks away, inmates regurgitate the pills back into their hand." Dkt. 162, at 12-13, ¶ 40.

Plaintiff presents testimony of two fellow inmates, Randy McCaa and Chris Goodvine, about the efficacy of the CCI medication policies. McCaa states that he overdosed in the DS-1 unit both before and after CCI procedures were changed to have officers hand out individual doses of medication. The final overdose he mentions was in October 2012. McCaa says that he was able to obtain pills from other prisoners. Goodvine provides a declaration saying he and "many" other inmates overdosed at some unidentified time, and that it was easy to stockpile medication because correctional officers would not watch to ensure that prisoners ingested their medication.

Plaintiff was housed in the DS-1 unit on observation status from December 26, 2013, to March 7, 2014. Defendant Norge was plaintiff's assigned psychologist during that time period. Plaintiff was originally placed in observation status at least in part due to threats of self-harm.

Plaintiff was evaluated daily by psychologists to determine whether he should continue to be placed in observation status. During those psychological contacts, plaintiff repeatedly presented thoughts of self-harm, anger and agitation, and did not deny feelings of depression.

Sometime in mid-January 2014, inmate Goodvine, who was also in observation status, wrote to the warden's office and spoke to defendant Morrison about plaintiff "preparing" to overdose on medications.

On January 21, 2014, at 9:50 a.m., Norge arrived at plaintiff's cell to review his placement in observation status. Norge had received a Psychological Services Request that morning from plaintiff indicating that he was feeling depressed. Plaintiff states that he had frequently previously told Norge that he was feeling depressed and was going to kill himself by overdosing on pills, but Norge did not place him in "one on one" observation status, where prisoners were watched even closer. Nor did Norge contact HSU staff to have his medication crushed, to make it even harder to stockpile. The parties dispute whether Norge was aware of a 2011 suicide attempt by plaintiff at the Wisconsin Secure Program Facility, in which he overdosed by stockpiling medication.

When Norge arrived at plaintiff's cell, plaintiff was sitting on his toilet, but not using it, and had his head down. Plaintiff told Norge that he could not take it anymore, that he was depressed, and that he felt like he wanted to give up and die. Plaintiff then opened his right palm and showed Norge a handful of pills. Plaintiff said that there were approximately 60 pills in his hand. He had a cup of water in his left hand. He put the pills in his mouth and swallowed them. Plaintiff told Norge that he swallowed "all" of the medication he was prescribed, including allergy, blood pressure, heart, and psychiatric medication.

Norge had no authority or ability to open plaintiff's door. As a psychological associate, he is not properly trained nor equipped to enter an inmate's cell to maintain safety and security, so he had to leave plaintiff's cell to notify security staff of the incident. It is undisputed that Norge did not carry a radio.

There is a dispute about Norge's response to these events. Defendants state that Norge immediately left plaintiff's cell and told the unit sergeant that plaintiff had ingested an unknown number of pills. Plaintiff says that Norge stayed at his cell for 30 minutes talking to him, and that Norge only left to get help after inmate Goodvine told Norge to get help. Defendants say that after Norge reported the incident, he returned to observe plaintiff and question him about precisely which medications he took.

When an inmate overdoses, standard protocol is for security staff to go to the inmate's cell, attempt to get the inmate to comply with restraining procedures, and escort the inmate away from the cell to receive proper medical attention. Security staff arrived at plaintiff's cell at 10:02 a.m. to remove him from his cell and to escort him to the Health Services Unit for medical attention. Plaintiff was taken out of his cell at about 10:05. The parties dispute whether plaintiff was argumentative about needing shoes before leaving.

Plaintiff was escorted to the HSU for a medical evaluation and it was determined that he needed to be hospitalized for emergency medical care. Plaintiff says that on his way to the hospital, "[his] body began to twitch and jerk severely and wouldn't stop" and that he lost consciousness. Dkt. 158, at 6. At the hospital, plaintiff continued to twitch so severely that staff had to hold him down on the bed.

Plaintiff returned from the hospital two days later. He was placed back into observation status since he had recently ingested a large amount of medication, and upon returning to the institution, still had thoughts of self-harm.

Defendants say that after this overdose, unnamed HSU staff members determined that it was necessary to change medication pass procedures for plaintiff, so he was placed on a "cuff for meds" restriction. On this restriction, a prisoner is restrained and removed from his cell, officers dispense his medication, and the prisoner swallows his medication in front of the officers while restrained. But plaintiff says that he was not placed on this restriction until April 2014.

Upon plaintiff's return, Norge evaluated him at his cell each weekday. Plaintiff also had a visit from the DOC psychology director.

On January 31, while Norge evaluated plaintiff at his cell, plaintiff said that he could not take it anymore, he was depressed, and he wanted to die. At 10:40 a.m., plaintiff opened his palm and showed Norge a handful of what appeared to be pills. Plaintiff then picked up a cup of water and ingested the handful. He told Norge that it was 50 pills. Norge says that the pills appeared to be partially dissolved. Plaintiff disputes this.

The parties again dispute Norge's response to plaintiff's actions. Defendants state that a security staff member walked by plaintiff's observation cell and Norge notified them of the incident, and the staff member immediately went to get the unit sergeant, while Norge remained at plaintiff's cell to speak with him about what had just happened. Plaintiff says that no security staff member walked by, and instead, Norge stayed and talked to plaintiff for about 30 minutes without getting help.

Norge says that plaintiff told him that he had ingested blood pressure medication, an anti-depressant, and sleeping medication, and that he had started to stockpile his medication upon returning from the hospital. Plaintiff denies saying this. Defendants also state that plaintiff was argumentative about needing socks and shoes before leaving, but eventually agreed to be escorted out. Plaintiff denies this. Plaintiff was taken to the HSU exam room, where it was determined that he should be taken to the hospital. Plaintiff returned to CCI later that day. Defendants theorize that plaintiff fashioned "pills" out of pieces of paper, because staff found a torn Psychological Service Request form in his cell. Plaintiff denies this.

Plaintiff later received a conduct report for lying about overdosing. Norge's report in conjunction with that conduct report states that plaintiff said he was dizzy after talking the pills. Dkt. 140-3, at 2.

## ANALYSIS

**A. Preliminary motions**

Plaintiff filed a motion to compel the production of documents he requested from defendants. Dkt. 143. But plaintiff filed his motion too quickly, only about two weeks after submitting his discovery requests. Defendants also explain that they have responded to his discovery request. I will deny plaintiff's motion.

Plaintiff also filed a motion to stay discovery until a ruling on his motion to compel, and to stay the dispositive motions deadline until after he receives the discovery he seeks. Dkt. 151. But plaintiff followed by withdrawing that motion. Dkt. 154. Accordingly, I will consider that motion withdrawn.

Plaintiff also asks for a free copy of his amended complaint. Dkt. 152. This court usually charges indigent parties 10 cents a page for copies of documents. The court has previously provided plaintiff with free copies of his original complaint and amended complaint as a courtesy. I will attach a copy of the amended complaint to plaintiff's copy of this order. But this is the last document the court will provide plaintiff for free. He should take care to retain this copy; any future copies of this 20-page document will cost him $2.00.

**B. Summary judgment**

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in

needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

### 1. January 21, 2014, overdose

I allowed plaintiff leave to proceed on claims that Norge was present at both of plaintiff's overdoses yet delayed in getting help. With regard to the January 21 incident, Norge states that once he saw plaintiff take somewhere between 60 to 90 pills, he immediately left plaintiff's cell and told the unit sergeant that Green had ingested an unknown number of pills. But plaintiff disputes this account; he states that Norge stayed at the cell for a half hour talking to plaintiff, and left only after fellow prisoner Goodvine shouted for Norge to get help.

Defendants contend that this dispute is immaterial because plaintiff does not present any evidence that a quicker response time would have made any difference to plaintiff. *See* Dkt. 161, at 2-3 (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain"). I disagree. Plaintiff says that he suffered severe

"twitching and jerking" on his way to the hospital and once he arrived, and that he lost consciousness. A reasonable jury could infer that more prompt medical treatment might have prevented some of the harm to plaintiff. Defendants also contend that plaintiff's own disagreeableness about leaving without shoes cost him a few minutes, but this is not significant enough of a delay to absolve Norge from any liability as a matter of law.

Defendants also contend that Norge is entitled to qualified immunity on this claim. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In deciding whether a right is "clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The right must be established "at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). Defendants contend that "the case law validates [Norge's] response and his inability to enter [plaintiff's] cell immediately after the overdose." Dkt. 135, at 18-19 (citing *Estate of Miller*, 680 F.3d 984, 993-94 (7th Cir. 2012). But in *Miller,* the court concluded that defendants' decision to undertake safety protocols before entering the prisoner's cell was reasonable. *Id*. Here, under plaintiff's version of events, Norge did not delay for the purpose of taking safety steps before entering the cell; he simply dawdled rather than get help. It is well established that prison officials cannot unreasonably delay in assisting prisoners with a serious health problem, and plaintiff's version of events is enough to stave off qualified immunity. Therefore, I will deny defendants' motion for summary judgment on this claim.

Plaintiff also brings claims against defendant supervisory officials. I allowed plaintiff leave to proceed on claims that defendants "are aware of the major problem DS-1 has with inmates, including plaintiff, committing acts of self-harm though overdosing on medication, yet persist in allowing medication to be administered in ways making it easy for prisoners to stockpile pills." Dkt. 53, at 6. In his amended complaint, plaintiff alleged that defendant supervisory officials allowed prisoners to possess dangerous quantities of non-controlled medication, which on its face seems unreasonable when dealing with suicidal inmates. But contrary to plaintiff's allegations, the undisputed facts here show that inmates in segregation are *not* allowed control over their non-controlled medications. Starting in July 2012, they were parceled out just as controlled medications are.

In his summary judgment briefing, plaintiff develops his claims further by asserting that the supervisory officials were aware that the policy by which staff parceled out medication was inadequate to prevent overdoses. Construing plaintiff's claims generously, I take him to be asserting that, whatever the exact procedures in effect, defendant supervisory officials were deliberately indifferent to the threat of him overdosing because they maintained procedures inadequate to prevent him from stockpiling medication while he was in observation status.

But the fact that plaintiff was able to overdose on January 21 does not prove that any of the supervisory defendants were deliberately indifferent to the risk. There were already procedures in place to thwart suicide attempts: prisoners were checked every 15 minutes, psychological staff made daily rounds, inmates were not allowed to possess even non-controlled medications, and officers were supposed to watch inmates swallow the medication they administered.

12

Plaintiff contends that this system failed, and it certainly did with regard to the January 21 overdose. Defendants agree that the system is not foolproof; prisoners have been able to circumvent the CCI procedures by regurgitating pills, and theorize that a prisoner could accomplish what plaintiff did by mouthing them or surreptitiously dropping them instead of placing them in his mouth. Plaintiff states that prison staff did not always watch inmates swallow their dosages.

But plaintiff does not bring claims against the correctional officers who shirked their duties. For defendant *supervisors* to violate the Eighth Amendment, they may be held liable under 1983 only if they are "personally responsible for the deprivation of the constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). This means that the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see[.]" *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).

Plaintiff could prevail if he could show that a defendant was aware of a substantial risk to him given the vulnerabilities in the medication policies prior to his January 21 overdose, and that official was in the position to take action to prevent the harm from occurring, yet failed to do so. But plaintiff largely fails to show that the named *supervisory* officials were aware of problems in the policies causing a specific danger of plaintiff overdosing.

Plaintiff does state that he warned *defendant Norge* that he was feeling suicidal, was stockpiling pills, and was going to overdose, and that Norge did not believe him, but plaintiff is not proceeding on a claim that Norge failed to protect him from overdosing. (Plaintiff's

claims against Norge are that Norge delayed in acting to help plaintiff after he overdosed.) Plaintiff also states that Norge failed to tell HSU staff about his threat to overdose, which tends to show that other prison officials were not aware of the problem.

Plaintiff contends that all of the supervisory officials were aware of the general problems with the medication policy and thus should have done something to make the provision of medications safer, such as create a policy directing that medications be crushed to prevent stockpiling. But plaintiff presents very little evidence indicating the scope of the overdose problem, so he fails to raise facts that could lead a reasonable jury to conclude that the policy was so inadequate that the supervisory defendants were deliberately indifferent for allowing the policy to remain in place.

Plaintiff suggests that inmates have "frequently" overdosed and have filed inmate grievances and lawsuits about the problem, but he does not support these statements with evidence showing that this is true, and that the individuals he names as defendants know about these events. Plaintiff does provide testimony from former CCI inmates Randy McCaa and Chris Goodvine. But this testimony does not present a clear picture of the medication policy's efficacy. McCaa states that he overdosed in the DS-1 unit both before and after CCI procedures were changed to have officers hand out individual doses of medication. The final overdose he mentions was in October 2012. Goodvine says he and "many" other inmates overdosed at some unidentified time, and that it was easy to stockpile medication because correctional officers would not watch to ensure that prisoners ingested their medication. But Goodvine does not provide the foundation for his knowledge that "many" inmates overdosed.

Given the scattered facts plaintiff has presented about two other inmates overdosing at unknown times or years prior to plaintiff's overdose, no reasonable jury could conclude

that supervisory officials showed deliberate indifference to plaintiff by failing to change the mediation policy in response to those prior overdoses. *See Frake v. City of Chicago*, 210 F.3d 779, 781-82 (7th Cir. 2000) (detention facility's policy of having cells with horizontal crossbars not deliberately indifferent even where there was a handful of suicides by that method, given the other safety procedures in place); *see also Miller v. Harbaugh*, 698 F.3d 956, 963-64 (7th Cir. 2012) (defendants entitled to qualified immunity on claim that bunk beds posed suicide risk even where there were three successful suicides using the bunk beds over a nine-year period).

The only piece of more concrete evidence plaintiff provides about pre-January 21 knowledge about a threat to *plaintiff* is testimony from Goodvine, who states, "On or about mid-January, 2014, I wrote to Warden's Office and spoke to Lt. Morrison about [plaintiff's] preparing to overdose as I was concerned for him." Goodvine's statement might support a more straightforward failure-to-protect claim, but plaintiff is proceeding only on a claim that the supervisory defendants maintained *policies* that caused a substantial risk to plaintiff. Goodvine's vague statement about plaintiff "preparing to overdose" is not enough to put defendant on notice that the prison polices put plaintiff at risk, particularly given the additional ways that inmates were monitored. *See Frake*, 210 F.3d at 781-82; *Miller*, 698 F.3d at 963-64. I will grant defendants' motion for summary judgment on plaintiff's claim against supervisory officials regarding the January 21 overdose.

### 2. January 31, 2014, overdose

Plaintiff brings a claim that defendant Norge again delayed in seeking help after plaintiff's January 31 overdose. Norge says he immediately got help, but there is a dispute of fact on this issue. However, it is unclear whether that dispute is material.

15

Neither side properly explains what happened in the January 31 incident. For example, plaintiff does not explain what he ingested. Plaintiff states that he swallowed 50 pills of some kind, but he does not explain what he swallowed and he disputes that he told Norge what type of pills he took. Defendants contend that plaintiff cannot show that he has a serious medical need, because HSU staff told Norge that tests showed only that plaintiff had normal amounts of acetaminophen and aspirin in his system. But they provide no evidence to back up this hearsay.

Defendants hypothesize that plaintiff tore up pieces of paper and swallowed them. Although plaintiff does not explicitly dispute defendants' proposed finding that Norge was told plaintiff's test results showed nothing unusual, he does dispute that he swallowed pieces of paper, and he affirmatively states that he swallowed 50 pills, which seems on its face to raise legitimate health concerns.

Plaintiff also fails to explain how he was harmed by the pills he took. As opposed to his description of how he convulsed and passed out during the January 21 incident, plaintiff does not say anything in his proposed findings about how he was harmed on January 31. But Norge's report in conjunction with a conduct report plaintiff received for lying states that plaintiff said he was dizzy after talking the pills.

It is possible that plaintiff thinks that it should go without saying that taking 50 pills of an undetermined type creates a serious medical need, but this is not so; because defendants contend that he cannot show that he was harmed, it is plaintiff's burden to present the court with the evidence he has that shows he had a serious medical need on January 31. Because I am unconvinced that I have received the parties' full versions of these events, I will direct them to submit a round of supplemental proposed findings and

16

supporting evidence concerning plaintiff's January 31 overdose. The parties are free to submit supplemental briefs as well if they so choose.

As for plaintiff's claims against the supervisory defendants for the January 31 overdose, their knowledge of the medication policy's inadequacy is greater than their knowledge before the January 21 overdose: an incident report filed after the first overdose was sent to most of the defendants. Thus CCI officials would have been aware that plaintiff had found a way to circumvent the medication handout policy and that he was likely to harm himself again in the future. Defendants appear to agree that further steps were necessary to keep plaintiff from overdosing; they say that plaintiff was placed on a "cuff for meds" restriction by "Health Services Unit staff." But plaintiff says that he was not placed on this restriction until April, which, if true, suggests that the parties responsible for making such restrictions failed to promptly take steps to protect plaintiff, even though they knew that the existing policy was inadequate.

If supplemental briefing shows that plaintiff could otherwise maintain an Eighth Amendment claim for his January 31 overdose, the proper defendants for that claim would be the HSU staff members responsible for providing further restrictions like a "cuff for meds" restriction. As with many of the details surrounding the January 31 overdose, the parties do not explain who these staff members are. In his supplemental materials, plaintiff should explain which defendants he believes were responsible for taking action once it became clear that he was able to horde medication. He may want to start with whatever information he has about the decision-making process involved in placing the "cuff for meds" restriction on him. For now, I will keep all of the supervisory defendants in the caption, with the exception of defendant Laurent, who did not work at CCI during these events.

**C. Motion to stay schedule**

Defendants have filed a motion to stay the October 3, 2016, trial date and associated pretrial submission deadlines pending resolution of their motion to dismiss. Because I am directing the parties to file supplemental materials regarding plaintiff's January 31, 2014, overdose, I will grant this motion, and set new pretrial deadlines and a trial date following resolution of defendants' motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Plaintiff Damien Green's motion to compel discovery, Dkt. 143, is DENIED.

2. Plaintiff's motion to stay discovery and dispositive motions deadline, Dkt. 151, is considered WITHDRAWN.

3. Plaintiff's motion for a free copy of his amended complaint, Dkt. 152, is GRANTED.

4. Defendants' motion for summary judgment, Dkt. 134, is GRANTED with respect to plaintiff's claim against supervisory officials regarding his January 21, 2014, overdose. Defendants' motion is DENIED with respect to plaintiff's claim against defendant Norge regarding the January 21 overdose.

5. I will stay a decision on plaintiff's claims concerning the January 31, 2014, overdose. The parties are directed to provide proposed findings of fact and supporting evidence concerning that overdose. The parties are free to submit supplemental briefs as well if they so choose. Plaintiff may have until October 3, 2016, to submit his supplemental materials. Defendants may have until October 13, 2016, to submit theirs.

6. Defendants' motion to stay the remaining schedule, Dkt. 166, is GRANTED. The remaining schedule, including the October 3, 2016, trial date, is STRICKEN.

Entered September 12, 2016.

                                  BY THE COURT:

                                  /s/

                                  _____
                                  JAMES D. PETERSON
                                  District Judge