IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAMIEN GREEN,

                Plaintiff,

  v.

KAREN ANDERSON, DANIEL NORGE,
DAVID MELBY, LUCAS WEBER,
MICHAEL MEISNER, RAY WOOD,
MICHAEL MORRISON, and SANDY HAUTAMAKI,

                Defendants.

OPINION & ORDER

14-cv-326-jdp

---

Plaintiff Damien Green, a prisoner at the Columbia Correctional Institution, alleges that various officials at CCI allowed him to stockpile medication while he was placed in observation during a previous stint there, enabling him to twice attempt suicide by overdosing. I previously granted in part and denied in part defendants' motion for summary judgment, and I directed the parties to provide supplemental briefing on some of Green's claims.

With regard to Green's first alleged overdose, which took place on January 21, 2014, I granted defendants summary judgment on Green's claims against supervisory officials for maintaining the medication-distribution policies that Green says led to his overdose. Dkt. 167, at 15. But I denied them summary judgment on Green's claim that defendant psychological associate Daniel Norge delayed in helping Green after he overdosed. *Id.* at 11.

With regard to the second alleged overdose, taking place on January 31, 2014, I concluded that neither side properly explained what happened in that incident. *Id.* at 16. For instance, Green did not explain what he ingested or how he was harmed by the pills he took, and neither side explained which defendants were responsible for failing to provide him with

further restrictions after the first overdose showed that he was able to stockpile medication. *Id.* at 16–17.

I directed the parties to provide supplemental briefing, which they have done. After the parties submitted these materials, Green submitted a renewed motion for recruitment of counsel, Dkt. 179, and a motion to stay the summary judgment proceedings until he is granted counsel, Dkt. 181. In particular, Green argues that he cannot effectively rebut the expert medical testimony submitted by defendants.

For reasons explained in this opinion, I make the following rulings. I will deny the motion for assistance in recruiting counsel. I will deny the motion to stay the summary judgment proceedings because the parties have already submitted their supplemental materials, and the summary judgment motion ultimately does not hinge on the expert testimony submitted by defendants. I will grant defendants summary judgment on Green's claims against the defendants who are supervisory officials, but I will deny the motion on Green's claim against Norge for failing to promptly seek medical attention for Green after Green's second overdose.

**A. Undisputed facts**

The following facts are drawn from the parties' original and supplemental summary judgment materials and are undisputed unless noted otherwise.

Plaintiff Damien Green is an inmate at the Columbia Correctional Institution. Defendants all worked at CCI: Karen Anderson was supervisor of the Health Services Unit (HSU), Michael Meisner was the warden, Lucas Weber was the security director, David Melby was a corrections unit supervisor, Michael Morrison was a lieutenant, Raymond Wood was the

Psychological Services Unit supervisor, Sandra Hautamaki was the deputy warden, and Daniel Norge was a psychological associate.

Green returned from the hospital after his January 21 overdose and was placed back in the Disciplinary Separation 1 unit, known as "DS-1." He says that he told staff, including Security Director Lucas Weber and DS-1 manager David Melby, that he would attempt to overdose again.[1]

The parties dispute whether prison staff modified their procedures to prevent Green from stockpiling medication. Defendants produce a "Medical Restrictions/Special Needs" form stating that Green was placed on a "cuff for meds" restriction on January 23, 2014. Dkt. 175-1, at 1. On this restriction, a prisoner is restrained and removed from his cell, officers dispense his medication, and the prisoner swallows his medication in front of the officers while restrained. Green says that he was not placed on a cuff-for-meds restriction until April 2014, by defendants Melby, Weber, and non-defendant Nurse Kim. Alternatively, I take Green to be saying that even if there was a formal restriction in pace before then, it was not followed.

Green continued to have suicidal thoughts. On January 31, while defendant Norge evaluated Green at his cell, Green said that he could not take it anymore, he was depressed, and he wanted to die. At 10:40 a.m., Green opened his palm and showed Norge a handful of what appeared to be pills. Green then picked up a cup of water and ingested the handful. He told Norge that it was 50 pills. Norge says that the pills appeared to be partially dissolved.

---

[1] Defendants object to this proposed finding, stating that Green does not cite evidentiary support for it. But Green submits a declaration stating that he "wrote everything in his supplemental proposed findings" and that "[e]verything [he] wrote is true and correct." Dkt. 171. This is sufficient to support his statements about events that are within his firsthand knowledge.

Green disputes this. Green says that the pills he took were mirtazapine 45 mg and citalopram 40 mg (antidepressants), atenolol 50 mg and lisinopril 10 mg (for high blood pressure), ranitidine 150 mg (Zantac) and pantoprazole 40 mg (to treat stomach acid and ulcers), acetaminophen 500 mg, and cetirizine 10 mg (Zyrtec) and Montelukast (Singulair) (allergy medications).[2]

The parties dispute Norge's response to Green's actions. Defendants state that a security staff member walked by Green's observation cell and Norge notified them of the incident, and the staff member immediately went to get the unit sergeant, while Norge remained at Green's cell to speak with him about what had just happened. Green says that no security staff member walked by, and instead, Norge stayed and talked to Green for about 30 minutes without getting help.

Norge says that Green told him that he had ingested blood pressure medication, an anti-depressant, and sleeping medication, and that he had started to stockpile his medication upon returning from the hospital. Green denies saying this. Defendants also state that Green was argumentative about needing socks and shoes before leaving, but eventually agreed to be escorted out. Green denies this. Green was taken to the HSU exam room, where it was determined that he should be taken to the hospital. Green's DOC medical chart from that day states that Green was in no apparent distress, but complained of a light headache. Dkt. 175-1, at 2. At the hospital, Green was given a series of lab tests. The medical record from that hospital stay also shows that Green reported suffering muscle spasms, he stated "I can't stop, I can't stop, please make me stop twitching," and he thrashed in his bed so severely that he

---

[2] Green does not include an "mg" notation after each number, but I will assume that each dosage is in milligrams.

needed to be physically restrained for placement of an IV. Dkt. 175-2, at 7. Green returned to CCI later the same day.

**B. Analysis**

Regarding the January 31, 2014 alleged overdose, Green brings Eighth Amendment claims against Norge for delaying in getting help after Green swallowed pills, and against the other defendants, supervisory officials who failed to change the way that medication was distributed to Green despite his overdose 10 days prior.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer*, 511 U.S. at 847. To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Defendants contend that all of these claims should be dismissed because Green's lab results show no evidence of overdose. They provide testimony from Dr. Jeffrey Manlove, a DOC physician at the Waupun Correctional Institution, stating that although several of Green's results, such as low sodium or low readings on aspects of his blood count, were outside the normal range, none of them indicated poisoning from a drug overdose. Other lab work showed no alcohol in his blood and no evidence for any presence of acetaminophen or non-steroidal anti-inflammatory drug. *See* Dkt. 175 (Manlove's declaration) and Dkt. 175-2, at 1–2 (Green's lab results).

From Green's motion to stay summary judgment, it appears that defendants did not disclose this expert to Green, in violation of Federal Rule of Civil Procedure 26(a)(2). But even if Manlove's testimony were properly disclosed, it would not foreclose a reasonable inference that Green suffered from a serious medical need. The medical record also shows that Green reported suffering muscle spasms, he thrashed in his bed, and he reported fluctuating pain levels. A reasonable jury could conclude that he was indeed harmed by the medication. And physical injury is not the only type of injury that could support this type of a claim: deliberate exposure to psychological harm, or heightened risk of an injury can violate the Eighth Amendment.[3] So for the same reasons that I denied defendants' motion for summary judgment on Green's claim against Norge for delaying after his January 21, 2014 overdose, I will deny their motion for summary judgment regarding Norge's alleged delay during the January 31,

---

[3] *Mathews v. Raemisch*, 513 F. App'x 605, 607 (7th Cir. 2013) ("[T]he district court was wrong to suggest that the plaintiffs needed to show something beyond psychological harm."); *see also Wright v. Miller*, 561 Fed. App'x. 551, 555 (7th Cir. 2014) ("Even without an actual injury, the mere probability of the harm to which [an inmate is exposed] can be sufficient to create liability."); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) ("[H]eightened risk of future injury from living in an infested jail is itself actionable.").

2014 incident.[4] Should defendants seek to introduce the testimony of Manlove or another medical expert at trial, they should file a motion in limine on that issue so that the matter can be resolved before trial.

Green's claims against the supervisory officials have less merit. Green's theory of deliberate indifference for those claims is that those officials knew that he overdosed on January 21, 2014, yet failed to make any changes to his medication-distribution protocols to prevent further stockpiling. Green does very little to explain how any of these officials were responsible for his individual medication-distribution rules. Defendants argue that the protocol was indeed changed after Green returned form the first overdose; there is a document showing that the Health Services Unit entered a "cuff for meds" restriction on January 23.

Green does not develop an argument that the cuff restriction was so ill-conceived that defendants could still be liable for an Eighth Amendment claim despite its enactment. He does argue that defendants Norge, Webber, and Melby could have canceled his medication altogether or mandated liquid medications more difficult to stockpile. But these options have their own problems: cancellation of his medications would likely have their own adverse effects on his health, and it is unclear how feasible the liquid-medication option is for each of these medications. In any event, it is not deliberate indifference for prison staff to choose one

---

[4] Although defendants do not raise this point in their brief, they submit a proposed finding stating that Green "admits that he has no personal knowledge that Dr. Norge waited at his cell for 30 minutes on January 31, 2014." Dkt. 174, at ¶ 106. They cite his deposition for that point, and it is clear from the deposition that Green does not know exactly how much time passed. But like anyone else, he can provide an estimate of that time. His version of events can be impeached at trial, but his lack of *proof* that the delay was 30 minutes is not reason to grant summary judgment to defendants.

preventive measure over another, unless the plaintiff can show that the preventative measure taken was ineffective. Green fails to do this.

Instead, Green argues that he was not actually placed on a cuff restriction until much later, in April 2014.[5] But regardless when the restriction was formally put in place, I take Green to be saying that he was not cuffed for medications between his two overdoses. So the question is whether any defendant knew that the cuff restriction either was not in place or was not being followed, the defendant was in a position to do something about the danger, and the defendant failed to take action. It is Green's burden to present evidence answering this question.

The only defendants against whom he presents evidence are Melby and Weber, whom he says issued him a cuff restriction in April. This raises a reasonable inference that they knew that the restriction was not in place at that time in April. But Green does not submit evidence suggesting that they knew that the restriction was not in place or not being followed *during the period between the two overdoses*, which is what would be necessary to show their deliberate indifference to the risk of him overdosing at the time of his second overdose. Because Green fails to carry his burden to show that he could prevail on his claims against the supervisory officials, I will grant defendants' motion for summary judgment on these claims.

---

[5] Other evidence calls this date into question: defendants submit an inmate grievance of Green's showing that Green alleged that he was placed on a "hook for meds" restriction on January 31 as punishment for that day's overdose. Although the parties do not explicitly state that "hook for meds" means the same thing as a cuff restriction, I take them to be in agreement that it is at least a similar restriction. But even the January 31 date is after his second overdose, so the grievance does not show that defendants placed the restriction on Green before the second overdose.

## C. Counsel

Green has been represented by two attorneys in this case. At the outset of the case, I granted Green's motion for the court's assistance in recruiting counsel to represent him. *See* Dkt. 53, at 8–9. But I later allowed that lawyer to withdraw from the case after he sent her inappropriate, sexually explicit letters. Dkt. 95. In particular, I stated the following:

> Volunteer attorneys willing to represent indigent parties in litigation are a scarce resource. Plaintiff has abused the privilege provided to him, and I will not recruit new counsel unless plaintiff can show an immediate need of medical assistance that prison officials refuse to provide and that is connected to this case. Given plaintiff's abuse of previous counsel and his recent transfer away from the Columbia Correctional Institution, where he received the treatment that forms the basis of his claims, it is unlikely that I would consider recruiting new counsel in this case.

*Id.* at 2. Green has since been transferred back to CCI, but he does not suggest that he is now in danger plausibly connected to this lawsuit.

After the parties submitted their supplemental summary judgment materials, Green submitted a renewed request for recruitment of counsel, Dkt. 179, stating that the inmate who had helped him on some of his filings, including his original summary judgment response, can no longer help him. He reiterates that he suffers from mental illness and lacks legal knowledge. I am not convinced from his filings in this and his several other cases in this court that his mental illness is a true impediment to his trying this case. He has submitted filings without the assistance of other inmates that are generally understandable. The larger issue is one facing all pro se plaintiffs: the difficulty of effectively litigating a trial. Any pro se litigant would unquestionably fare better if they had counsel at trial. And I understand that litigating a trial is a substantially more daunting task than responding to a summary judgment motion or submitting other filings.

Still, I must consider Green's capabilities and the complexity of the case, as well as his prior misconduct. The surviving claims are relatively straightforward and mostly a question about whether Norge truly did delay in getting Green medical attention. Defendants indeed seem likely to attempt to bring expert testimony about whether Green actually overdosed the second time, but as I stated above, that testimony might not be allowed, and even if it is, it does not directly rebut Green's stated symptoms. Given Green's prior misconduct, I do not think that it is appropriate to recruit new counsel. The court is stretched for volunteer attorneys as it is. The problem would be exacerbated further by allowing plaintiffs to mistreat their first attorneys and still be awarded a second. Pro se litigants do not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), much less the privilege of receiving a second.

A second lawyer, Matthew Steven Pinix, appeared on Green's behalf without the court recruiting him. *See* Dkt. 190 (Pinix's notice of appearance). But Pinix moves to withdraw from representation. Counsel seeking to withdraw representation needs to show either the party's consent or that there is a "valid and compelling reason" to withdraw over the party's objection. *Stafford v. Mesnik*, 63 F.3d 1445, 1448 (7th Cir. 1995). I will give Green a short time to respond to this order, stating whether he objects to Pinix's withdrawal. Should Green object, I will set a deadline for Pinix to submit ex parte and *in camera* his reason for withdrawing. After this issue is resolved, the court will hold a conference to schedule a new trial date and associated pretrial-submission deadlines.

ORDER

IT IS ORDERED that:

1. Plaintiff Damien Green's motion to stay summary judgment proceedings, Dkt. 181, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 134 is GRANTED in part and DENIED in part as discussed in the opinion above. The case will proceed to trial on the following claims:

   - Defendant Daniel Norge delayed in getting plaintiff medical attention after his January 21, 2014 overdose.

   - Defendant Norge delayed in getting plaintiff medical attention after his January 31, 2014 overdose.

3. Defendants Anderson, Meisner, Weber, Melby, Morrison, Wood, and Hautamaki are DISMISSED from the case.

4. Plaintiff's renewed motion for the court's assistance in recruiting him counsel, Dkt. 179, is DENIED.

5. Plaintiff may have until September 18, 2018, to respond to counsel's motion to withdraw, Dkt. 191.

Entered September 4 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge