IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAMIEN GREEN,

                     Plaintiff,

  v.

DANIEL NORGE,

                     Defendant.

OPINION and ORDER

14-cv-326-jdp

---

Plaintiff Damien Green, appearing pro se, is currently a prisoner at Waupun Correctional Institution. Green alleges that while he was housed at Columbia Correctional Institution, defendant Daniel Norge, a psychological associate at the prison, violated his Eighth Amendment rights by twice delaying in getting him help after he overdosed on medication.

The court held a bench trial on March 11, 2019. This opinion sets out the court's findings of fact and conclusions of law as required under Federal Rule of Civil Procedure 52. I conclude that Green has failed to prove that Norge violated his Eighth Amendment rights, so I will direct the clerk of court to enter judgment for Norge for the claims tried on March 11, and to enter judgment for the other defendants in this case regarding Green's claims that have previously been dismissed.

FINDINGS OF FACT

On January 21 and again on January 31, 2014, Green was sent to the hospital for overdosing on stockpiled medication. The issue at trial was whether Norge responded promptly to Green's overdoses. Green contended that after witnessing the overdoses, Norge did nothing for 15 to 30 minutes. Norge contended that he promptly sought medical attention for Green.

The general factual outline is not disputed. From December 26, 2013 to March 7, 2014, plaintiff Damien Green was placed on observation status in the Disciplinary Separation 1 (DS-1) unit at Columbia Correctional Institution. Green was placed in observation status because he made threats of self-harm. While in observation he continued to state that he felt depressed and that he thought about harming himself. Green was checked roughly every 15 minutes by prison staff, and he was visited every workday by an employee in the Psychological Services Unit. Defendant Dr. Daniel Norge, a psychological associate at CCI, conducted most of these daily reviews.

Green was prescribed various medications, including antidepressants, blood-pressure medication, heart medication, and allergy medication. At least three times a day, correctional officers would dispense medications to prisoner at their cells. The officers were supposed to watch the inmate swallow each pill. But officers did not ensure that Green swallowed his medication. So Green was able to stockpile medication, and he stored pills by wrapping them in facial tissue.

On January 21, when Norge came to Green's cell, Green showed Norge a handful of pills that he had stockpiled. Almost immediately, Green swallowed the pills with from a milk carton. Green was taken to Divine Savior Hospital in Portage. Green was then flown by helicopter to University of Wisconsin Hospital in Madison. Green spent two days recovering at the hospital.

Green continued to report that he was suicidal after her returned to CCI. On January 31, Green showed Norge another, smaller handful of what appeared to be pills. Again, Green took them. Green was again taken to Divine Savior Hospital, where he was given an IV and charcoal. He returned to CCI later that day.

2

The critical issue is what Norge did right after seeing Green take the pills.

Norge testified on his own behalf, and he did not call any other witnesses. Norge said that he went to Green's cell on January 21, 2014 in part because he reviewed Green's status daily, but also in part because Green had filled out a Psychological Services Request form stating that he was feeling suicidal. Norge kept records of the timing of the events at issue here; he said that he routinely checked his watch to mark down the timing of events in his notes. He would then use those notes to write out reports, and he would shred the original notes.

In his incident report for the January 21 incident, Norge said that he saw Green at 9:50 a.m.; Green was sitting on the toilet but not using it. Green showed Norge a handful of pills and swallowed them; Norge noted the time as 9:53 a.m. Norge left the observation area and told the unit sergeant about Green's self-harm at 9:55 a.m. Norge went back to the cell to ask Green about what medications he took because that information would be useful for treatment purposes if Green ended up passing out. Staff came to Green's cell at 10:02 a.m., but Green argued that he wanted his shoes, delaying his exit from the cell until 10:05 p.m. Records from Divine Savior Hospital show that Green arrived at the hospital at 10:29 a.m., which would mean that it took 24 minutes to get Green from his cell to the hospital in Portage.

According to Green's testimony, Norge came to Green's cell at about 8:30 a.m. Green said that Norge did not immediately get help, but instead stayed at his cell for 20 to 30 minutes, asking him questions about where he got the pills. Meanwhile, according to Green, other inmates in the observation unit yelled at Norge to get Green help. In their testimony, inmates Phillips and Goodvine generally corroborated Green's testimony that Norge did not immediately go for help, but delayed at Green's cell. (I do not credit the testimony of Green's

witness Scott Brown because he was not incarcerated in the bank of observation cells in the DS-1 unit on the dates in question.)

I find that Norge's testimony about the January 21 incident is wholly credible, but Green's is not. Green's testimony cannot be reconciled with the timing of his arrival at Divine Savior Hospital. No one challenged the fact that it would take a bit less than half an hour to get Green from his cell, to HSU, through the institution, and to Divine Savior Hospital in Portage. If, as Green testified, Norge delayed at his cell for 30 minutes, then he would have called for help around 9:00 a.m. That would put Green at the hospital around 9:30 a.m. But hospital records put Green's arrival at 10:29 a.m., which leaves about an hour unaccounted for in Green's version. Norge's testimony is corroborated by his contemporaneous reports and the hospital records.

Green's credibility is also undermined by his poor grasp of the details of the events. For example, he says he spent four or five days recovering at the University of Wisconsin Hospital, but records show that he was released back to CCI on January 23, just two days after the overdose. Goodvine's testimony is undermined because it is inconsistent with that of other witnesses. Goodvine said that Norge pleaded with Green not to take the pills for a while before Green actually swallowed them; the other witness said that Green took the pills quickly after Norge came to his cell.

I also find that Norge's testimony about the January 31 incident is wholly credible for similar reasons. Green said that Norge delayed about 15 to 20 minutes in getting help. But again Green's testimony is rebutted by the records. Norge noted the time that Green took the pills on January 31 as 10:40 a.m. Norge testified that, almost immediately, Officer Cotton, who was conducting the 15-minute observation checks, walked into the observation area.

Norge told Cotton about the overdose. The observation log shows a 10:44 a.m. entry by Cotton saying, "Doctor talking to inmate." Security staff came and was taken to HSU and on to Divine Savior Hospital. Hospital records show that Green arrived at 11:15 a.m. Again, it took about half an hour to get Green from his cell to the hospital. There is not enough time to account for even 15 minutes of delay by Norge.

In sum, I find that Norge's version of events is credible and Green's and his witnesses' versions are not: Norge did not delay in seeking help for Green after either overdose. Instead, he got help from the control bubble within a couple of minutes after the first overdose, and he got help from Cotton almost immediately after the second overdose.

CONCLUSIONS OF LAW

To prevail on his Eighth Amendment claims against Norge, Green needed to prove that he had a serious medical need and that Norge acted with deliberate indifference toward it. Green had a serious medical need on both occasions. And the medical records show that his January 21 overdose was quite serious. Norge suggested that on January 31, Green might have faked an overdose by swallowing torn up pieces of paper. But Norge produced no persuasive evidence in support of this theory, so I will credit Green's version; I conclude that he had a serious medical need on January 31, too.

But because I find as a matter of fact that Norge did not delay in getting Green help on either occasion, I conclude that he did not violate Green's Eighth Amendment rights. I will direct the clerk of court to enter judgment for Norge on those claims, and also to enter judgment for the other defendants originally named in the case for the claims that I dismissed in previous orders.

ORDER

IT IS ORDERED that:

1. Plaintiff Damien Green has failed to prove by a preponderance of the evidence that defendant Daniel Norge violated his Eighth Amendment rights on January 21 and 31, 2014.

2. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered March 29, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge